Nicholson, C. J.,
delivered the opinion of the Court.
At the November Term, 1871, of the Lincoln County *378 Circuit Court, John C. 'Williams was tried for the murder of Toliver B,. Garret, and convicted of murder in the second degree, and sentenced to the Penitentiary for twenty years. His motions for a new trial and in arrest of judgment having been overruled: he has appealed to this Court.
The first error assigned is, that the judgment ought to have been arrested, because it appears upon the face of the indictment that the grand jurors were duly elected, “impounded,” sworn, &c., instead of being elected, “impanelled, sworn, &c. In the indictment, as copied in the transcript, the word is “impanelled. It is said that the word in the original indictment may be read either “impanelled” or “impounded.” The presumption is, that the real word intended to be used was “'im-panelled,” instead of “impounded,” as this would make sense, while the word “impounded” would mean nothing. There is no substance in the objection, even if the nonsensical word “impounded,” had been plainly written.
The next objection is, that in describing the offense of murder in the first degree, the word “unlawfully” is omitted in the indictment.
This question was settled in the ease of Williams v. The State, 3 Heis., 37. This objection, therefore, is not well taken.
It is next objected that incompetent testimony was given by the witnesses, Burnett, Baker and Biley. These were defendant’s witnesses, introduced by him to show that Garret had an old grudge at defendant, and that the fact of his having this old grudge was communicated to defendant before the killing. In detail *379 ing the entire conversation between the witnesses and Garret, independent transactions were alluded to by him, which the State would not have had the right to prove. But when the witnesses detailed parts of the conversations, the State had a right to have them all detailed. For this reason, and because no objection was made by the defendant to the evidence when given, he can not now object to it.
The nest objection is taken to the charge of the Court. The charge is full, and in detail as to the several grades of homicide embraced in an indictment for murder in the first degreee. The several offenses are correctly defined; the proof to sustain each stated; the distinguishing characteristics of each offense fully laid down, the necessity of the ingredients being proven beyond a reasonable doubt, and the circumstances under which the homicide would be justifiable: all these matters are fully explained to the jury; but the Judge, so far as appears in the charge, said nothing on the subject of involuntary manslaughter.
This is urged as a fatal error. There are several answers to this objection. First, the record shows that “among other things not objected to, the Court charged as follows,” &g. The presumption is, that the judge charged satisfactorily to defendant as to involuntary manslaughter, and for that reason, that portion of his charge was omitted. Second, the facts, as they appear in the bill of exceptions, do not show that a charge as to involuntary manslaughter would have been pertinent.[1] And third, *380 the judge was not requested to charge the jury- on this branch of the law of homicide, though he was requested to charge on a hypothetical state of facts, that defendant would not be guilty of either “murder or involuntary manslaughter.” It is clear, therefore, that the objection to the charge is not well taken.
The last, and most important question raised, is, as to the sufficiency of the evidence to support the verdict. The settlement of this question makes it necessary to examine with care the evidence in the case.
The first witness for the State was William Edwards. He proves that Garret was killed about the 1st of September, 1870, at witness’ house. He was shot by defendant with a shot gun, and did not live a minute. Garret, was employed by witness to build a stable, but he was not at work that day. He was at witness’ house early in the morning, and afterwards was at witness’, and defendant’s still-house, and was drinking, but remained but a short time, and made no inquiries for, or said anything about defendant. Garret returned again to the still-house in the evening. Witness and defendant were gearing up the team to haul some brandy to witness’ house, which was about a quarter of a mile distant. Defendant’s house was about a mile distant. When Garret re *381 turned to the still-house in the evening, he “came cursing, ripping and swearing.” He got off his horse, took the proof vial, sunk it into a barrel of brandy, came to where defendant and witness were, put his thumb on the mouth of the vial, as if he was going to try the bead, struck the vial in his hand, and looking at defendant, drank a toast, which was a vulgar toast. It was not a toast of friendship or health, but was a vulgar toast. Defendant said to witness: “I must leave here, or I will have a difficulty with Garret.” Witness advised him to go, to avoid a difficulty with Garret. Defendant then left, and went to witness’ house. Garret was at the still-house about half an hour. Witness left the still-house a short time before Garret, leaving at the still-house. Garret, McIntosh and Stroud. Defendant had left the still-house some time before witness did. Garret overtook witness and Tillery, and the three went together to witness’ house; witness walking, Tillery driving the wagon, and Garret riding horseback. On the way, Garret pulled out his pistol and waived it. This was about three hundred yards from witness’ house. The pistol was then put up. They approached the house on the east side. Witness pulled down the fence to let in the wagon, but Garret leaped the fence with his horse before it was pulled down. When the three got in sight of witness’ house, they came to the road leading to Garret’s house, which passed about forty yards from witness’ house. Witness tried to get Garret to go on his road home, saying to him, “yonder is Williams’ horse.” Garret said, “I have got to have another dram.” After they got into the house, witness said to Garret, “if I give you another *382 dram, will you go off,” and he said he would. But before this, Garret had helped witness, defendant and Til-lery, unload the wagon. After witness gave Garret the dram, he got on his horse and started off. He afterwards came back, and called witness out, and the two were talking about exchanging some brandy for bacon. Garret said, “there is one fellow in the house that he would go that far in hell for,” (measuring about twelve inches on his arm.) Tillery and defendant were in the house at the time. Garret and Tillery were unfriendly at the time, but they spoke to each other. Witness says that when Garret went into the house when they arrived with the brandy, there were only two or three words passed between him and defendant. While witness and Garret were talking about the exchange of brandy for bacon, defendant stepped to the door and said, “Garret, you have come for a fuss, and by G — d, if you don’t mind you will get it.” Garret replied, “just walk out, and you can have it. I will give more than you can take, or can carry off from here.” WTen Garret said that, defendant stepped back and got his gun, and then stepped out oh the puncheon between the houses, and said, “are you in the same notion still,” and defendant shot him. When Garret saw defendant with the gun, he said, “by G — d, let it come.” He was at the time sitting on his horse, about eight steps from the house. His pistol, a five or six shooter, was in his left pants pocket. He was a left-handed man. Garret had been living in the neighborhood about two years. When sober he was a peaceable man, but when drunk he was a dangerous one. He was drunk that day. He was a small man, tolerably stout, and a little larger than *383 defendant. While unloading the brandy, Garret and defendant did not speak. One had one end of the barrel, and the other the other end. Garret' did not draw, or attempt to draw, any weapons, after he came to the house. At the time defendant said to Garret, “you have come for a fuss, and by G — d if you don’t mind you can get it,” Garret had not said anything to defendant, or about defendant; that is, did not mention defendant’s name. It was about eight steps from the house when Garrett said, “He would go twelve inches in hell for a fellow in the house.”
Milly Edwards, for the State, proved that defendant was at her house the day Garret was killed. Defendant came first. After he got there, he said, “he had seen Garret at the still-house, and Garret was cutting up down there; that Garret had said nothing to him, but he knew Garret was pitching it all at him.” Defendant got his gun and called for powder. He sat down and laid the gun across his lap. This was before Garret got in sight. "Witness saw Garret coming, and told defendant to go and hide from* him. He said, “he had been running long enough, and he did not intend to run any further.” He then told me and Mrs. Fowler to go into the other room. He then saw Garret coming, and got up and set the gun behind the door. Witness told defendant to run. He said, “he had given up his house once to Garret, at the Plains, and he was not going to run any more.” "Witness saw Garret when he came up. He was not doing anything. He came up behind the house, after he started off, and talked with Edwards. The gun belonged to *384 'Williams; he left it at Edwards’ some time in passing, two or three weeks before. He took the gun off with him. She did not see the shooting. Garret rode close up to the house, when he came back. Defendant was sitting down. Witness Avas standing up.
Mrs. Fowler, for the State, proved that she was at Edwards’ the day Garret was killed. Defendant said: “If Garret comes up, he intended to kill him; he had run long enough.” He had the gun across his lap, scraping it; said to me to go into the other house. Garret came up and said “howd’y” to me, and nodded his head to defendant; but defendant did not speak. Garret came up horseback; was off of his horse when he spoke. Before Garret came, defendant said he had run his last time. Witness left before the killing.
On cross-examination, witness said, the first she saw of defendant, he was sitting in the door, with the gun in his hand. Garret walked up to the house and nodded. She don’t know whether he spoke to witness or defendant.
This was all the testimony of the State, a’s to what occurred at the house at the time of the killing.
Byers, for the State, proved that, on the day of the difficulty at Pleasant Plains, about six months before the killing, defendant came to him for a gun. He did not get it. Defendant made no threat against Garret. Garret wanted witness to get half a pint of whisky from defendant’s grocery, saying that he did not want to go there; that he did not want 'to meet defendant. Garret had a shot gun and pistol.. He was *385 very drunk that day; heard him make no threats against defendant; he was inclined to be boisterous when drunk.
John J. Rauls, for the State, proved that he was at the Plains the day of the difficulty; saw some demonstrations between defendant and Garret that day; heard no threats by defendant; saw Garret knocking around on the streets with a gun; at the same time defendant came into witness’ store and got a shot-gun, and loaded it. He next saw defendant when Garret was down on the ground or platform; defendant had a gun, and said: “Shoot him,” or, “kill him;” this was soon after defendant got the gun. Heard Garret say nothing at the time; was very drunk, and down on the ground. Defendant did not try to shoot Garret.
M. D. Hutchinson, for the State, proved, that, the evening after the difficulty, he was with defendant; he said Garret said to him, that he, Garret, was one of the boys that feared no noise; and defendant said that was the first time he knew that Garret had anything against him.
J. M. Davis, for the State, proved that he went after defendant, after Garret was killed; did not find him at home. Afterwards, went to Limestone county, Ala., and arrested him.
Buck Roper, for defendant, proved, that about a year before the killing, he rode out from Pleasant Plains in company with Garret and defendant. Witness rode between them. Garret told defendant “not to laugh at his stirrup leather, if it was a rope.” Defendant said he had not laughed at his rope stirrups. Garret said *386 he was one of the boys that feared no noise, although one hundred and twenty miles from home. He repeated this expression ten or fifteen times. When he used it first, he drew a pistol. Defendant asked him if he wanted a fuss: he said he did. Defendant told him to put up the pistol, he had nothing against him, and he put it up. Garret drew the pistol three or four times. Garret told witness to ride on, that he might settle it with defendant. Witness told him “he would not do so; that he did not want him to kill defendant.” This was about a mile from the Plains. When they got to the forks of the road, defendant and witness turned off to go home. Garret got down and hitched his horse to a bush, and pulled out his pistol, and wanted defendant to fight him;' defendant rode on, and Garret followed him about one hundred yards. Defendant told him to put up his pistol; was all he said, and Garret put it up. • Witness is the nephew of defendant. Garret was about half drunk; he did not present his pistol at defendant
Dick Burnett, for defendant, proved that on the evening of the difficulty detailed by the last witness, Garret came by his house; said he had a fuss with defendant; wanted him to fight it out fair; that defendant run off. Witness ¡told this to defendant four or five months before the killing.
E. M. Dunlap, for defendant, proved that he witnessed the difficulty at Pleasent Plains. He was in the front room of defendant’s grocery, with defendant Til-lery, and others; saw Garret coming across the street with his gun. Defendant and Tillery both remarked, *387 “Yonder comes Garret for a fuss.” All went into the back room, except the defendant, and commenced playing cards for fun. Heard Garret come into the front room, and stop in there for a time, and heard a rattling of glasses. Garret came into the back room and commenced cursing, and said he could beat a certain man at his own game. Tillery soon got up and started out. Garret jumped up, grabbed his gun, and said he would kill them. Defendant jumped over the counter, and went out the front door with Tillery. Witness seized the gun and took the caps off, and gave it back to Garret. Garret went hurriedly to the front door, and asked, “which way have they gone?” Witness told him a contrary direction from that they had gone. Never heard Garret make any threats. About ten minutes afterwards, saw Garret with a pistol belted round him. Garret was drunk. Saw him lying on the ground. Witness knocked him down for striking him. Defendant came up with a gun and said, “kill him.” Garret went to Hodges’ store, asked if they had gone in there. Hodges met him at the door, and told him, “no, not to come in there; there was some ladies in there.” He said he would go in, and presented his gun at Hodges, and snapped it. Hodges was in the act of throwing a weight at him, when witness hollered not to throw; there were no caps on the gun. Hodges knocked him down. Defendant put up his gun after the difficulty.
Gillespy Riley, for defendant, proved, that, in 1869, Garret told him, he and defendant had had a fuss tha day, and that “if defendant would not shoot it out, or fight it out, it would have to stop right there; but *388 he ever came to his house to abuse him, as he had done once, he would hurt him.” On cross-examination, he said, in the same conversation, that defendant, Tillery, Daniel Hardin and Jim Vickers had come to his house in disguise, and abused him, and if they ever came again, he would hurt them.
Irvin Baker, for defendant, proved, that, last spring Avas a year, saw Garret with a shot-gun in his wagon. Asked him what he was going to do with it. Said there was a good many squirrels, and he would shoot them if they came in his way. Said he had been run over and imposed upon by men on his own premises, • and if it happened again he was going to defend himself, and his wife and children. He did not say it was defendant. "Witness told defendant of this. On cross-examination he said, two of the parties in disguise were Daniel Hardin and Jim Vickers. At the time witness told defendant what Garret said, witness says, “he approached me in a rough manner, cursed me, said G-d damn you, hold on there; G-d damn you, don’t speak to me again. Said, G-d damn you; I was frightened.” Witness then told him what Garret said.
Thomas Allison, for defendant, proved that he was at the still-house on the day of the killing; late that evening heard Garret swear he would kill defendant before sun-set, or defendant would kill him. Said it twice. He did not tell defendant of it. Garret had a pistol — six-shooter, in his right pants’ pocket. His conversation with Garret was in the still-house; no one present. It was an hour and a half after defendant left, before Garret left. Defendant came back after- *389 wards, and told witness Garret was killed up there, and to go and take care of him. Garret left half an hour after he made the threat. Witness said, he did not say to A. D. Anderson, in Fayetteville, on Tuesday last, that Garret said, if defendant ever interrupted him, he would kill him.
A. D. Anderson, for State, proved, that, on last Tuesday, in Fayetteville, Thomas Allison told him that Garret said, if defendant ever fooled with him any more, he would kill him.
The question to be determined upon this evidence, is, whether the verdict of murder in the second degree is sustained thereby. As the jury have found that the defendant was not guilty of murder in the first degree, it it is unneessary for us to inquire, whether the killing was attended with that deliberation and premeditation requisite to constitute murder in the first degree.
The proof as to the killing by the defendant, with a deadly weapon, is clear and uncontradicted. The presumption, therefore, is, that it was done with malice. This presumption stands until it is rebutted by evidence showing either that the killing resulted from passion produced by sufficient provocation, or, by evidence that the killing took place under circumstances which excused the defendant for taking the life of the deceased, either to save his own life or to prevent great bodily harm.
It is abundantly shown, by the evidence, that there was an old grudge between the defendant and • deceased. On the part of the deceased, it is shown that he be- *390 Keyed the defendant, together with others, had visited his house in disguise, and had abused him; in what way the evidence does not show; but it was shown that the abuse was such that the deceased brooded over it, and cherished the purpose of having revenge.'
This feeling of revenge is shown to have been cherished by the deceased down to the very moment when he was killed. Almost the last words that he uttered, were, that he would go twelve inches into hell to have revenge.
On the part of the defendant, it is shown that his hostility to the deceased grew out of the difficulty on the road — when the deceased endeavored to provoke him into a difficulty — and out of the conduct of deceased at Pleasant Plains, when he was driven from his house and forced to seek safety in flight. His hostility to the deceased on that occasion was manifested by his approaching him when lying on the ground, knocked down, calling for him to be shot or killed. It was distinctly manifest, only a few minutes before the killing, in his declarations to the two female witnesses, that he had been driven from his home by the deceased, that he had run from him for the last time, and that if deceased came there he would kill him.
An old grudge is, therefore, clearly proven, and the law presumes that the killing occurred on this old grudge, unless the proof shows a new and sufficient provocation — and then the law would presume that the killing was on the new provocation — and if that provocation was sufficient in law to reb.ut the presumption of malice, the offense would be voluntary manslaughter *391 or in self-defense, dependant upon all the proof. Was there sufficient provocation for the killing to rebut tbe presumption of malice? It is not shown that the defendant was informed of the threat made at the still-house, as proved by Allison — if it be conceded that any such threat was made there — and if it was made, and had been communicated to defendant, it would not be such provocation, because no words are regarded as sufficient provocation in law. Defendant admitted to the female witnesses that the deceased had said nothing to him at the still-house, but his conduct there had impressed him with the belief that deceased was seeking to bring on a difficulty. This was not such provocation as excited his passions, and impelled him at once to resent the insult; but it only produced the conviction in his mind that it would be prudent for him to leave, in order to avoid the difficulty which he apprehended.
After the deceased came to the house he spoke only two or three words to defendant, according to the testimony of Edwards, and what these were we are not informed. According to the female witnesses, deceased, when he came up, nodded and said “howdy.” It is not certain, by the evidence, to whom he nodded or to whom he said “howdy;” nor is it shown that there was anything peculiar or significant in the “nod.” Defendant took no exception to deceased’s conduct on that occasion; they went out together and helped to unload the wagon. Up to this point of time, there was no provocation. But the deceased got on his horse and started off, and very soon returned and called for Ed *392 wards. While conversing with Edwards about exchanging brandy for bacon, he made the remark that “there was a fellow in the house he would go twelve inches in hell for.” The only proof that defendant heard this re.mark, is, that it was made within eight steps from the house in which defendant was sitting, and as the distance was such that the remark might be heard, it is inferred that he did hear it. If this be true, as significant as the language was, of the malice of the deceased, towards either the defendant or Tillery — for both were in the house, and he had the same cause for hostility to both — yet, the law regards no language, however violent or offensive, as sufficient provocation for taking life. But if defendant heard the offensive remark, the proof shows that it did not excite his passions and impel him to do the killing under the influence of passion; but he rose from his seat and, without getting his gun, stepped to the door and said to the deceased: “You have come for a fuss, and by G — d if you don’t mind you can get it.” At that time deceased was sitting on his horse; he made no demonstration by drawing his pistol; it does not appear from the proof that he knew defendant had a gun behind the door in the house. He replied: “Just walk out and you can have it. I will give you more than you can take or carry off from here.” Without saying more, defendant retired from the door, got his gun, and returned; but even then he did not instantly fire, but said, “are you in the same notion still?” When the deceased saw defendant return with his gun, his only words were, “by G — d, let it come,” and thereupon defendant fired and killed him.
*393 There was no manifestation of passion on the part of defendant, and there is nothing shown on the part of deceased which the law regards as a sufficient provocation. We are, therefore, of opinion that the killing was with malice, unless the proof shows that the defendant was in such imminent danger of his life, or of great bodily harm, as will make the killing justifiable in self-defense.
It is insisted for defendant, that the facts in proof bring this case within the principle of Grainger v. State, 5 Yerg., 459. Judge Catron stated the facts on which his opinion rested, as follows: “Grainger used all the means in his power to escape from an overbearing bully. He was shuddering with fear, and his last hope of protection was defeated when Rainey’s door continued closed against him. He shot only to protect his person from threatened violence, and that great. It was certain. Henson sat quietly on the fence; the woman and Rainey did not open the door; they no doubt were afraid of Broach, who displayed the traits of a reckless bully, and would have attacked Grainger the moment he reached him, as well in the house as out of it. From Henson no assistance could be hoped for.” Upon these facts Judge Catron said: “Was there malice prepence, in this case of homicide, so as to exclude the benefit of clergy within the 23 Henry 8, c. 1? Did Grainger display a cold, deliberate, and wicked conduct? a heart lost to all social order, and fatally bent on mischief? It can not be believed. He behaved like a timid, cowardly man, was much alarmed; in imminent danger of a violent and instant *394 assault and battery, and was cut off from the cbanees of probable assistance.”
In the case of Rippy v. The State, 2 Head, 218, Judge Carutbers, after recognizing the doctrine of Grainger v. The State, as explained by that of Copeland v. The State, 7 Hump., 479, because of the perversions and misapplications of that case by advocates and juries, proceeds to lay down the law as follows: “The law on the subject is, that, to excuse a homicide, the danger of life or great bodily injury, must either be real or honestly believed to be so at the time, and upon sufficient grounds. It must be apparent and imminent. Previous threats, or even acts of hostility, how violent soever, will not of themselves, excuse the slayer, but there must be some words or overt acts at the time, clearly indicative of a present purpose to do the injury. Past threats and hostile actions, or 'antecedent circumstances, can only be looked to in connection with present demonstrations as grounds of apprehension. To constitute the defense, the belief or apprehension of danger must be founded on sufficient circumstances to authorize the opinion that the deadly purpose then exists, and the fear that it will at that time be executed. The character of the deceased for violence, as well as his animosity to the defendant, as indicated by words and actions then and before, are proper matters for the consideration of the jury on the question of reasonable apprehension. Even if sufficient cause to fear does exist, but the deed is not perpetrated under the apprehension it is calculated to inspire, or the fear is feigned or pretended, the defense will not be available. *395 So a ease must not only be made out to authorize the fear of death or great bodily harm, but such fear must be really entertained, and the act done under an honest and well founded belief that it is absolutely necessary to kill at that moment to save himself from a like injury. It is scarcely necessary to remark, that a real or apparent necessity, brought about by the design, contrivance, or fault of the defendant, is no excuse.”
The law as laid down in Grainger v. The State, explained, analyzed, and defined, in the case of Rippy v. The State, must govern the case now before us. The proof of previous threats and hostile acts by the deceased, indicating feelings of settled animosity, and purpose to have revenge, for injuries alleged to have been inflicted on him by the defendant, is abundant. His conduct about a year before he was killed, while riding along the road, repeatedly drawing his pistol, seeking persistently to provoke the defendant into a difficulty, shows clearly that he was then filled with hatred towards the defendant, and eager for a pretext to take his life. His acts afterwards, at Pleasant Plains, when the defendant escaped from his violence by deserting his own house, show that there was no abatement of his hostility to the defendant. His conduct on that occasion, as well as other evidence, shows that when drunk, he was a most violent, reckless and dangerous man.
The fact that his hostility towards the defendant was manifested, in this violent and dangerous manner, while he was drinking, furnishes strong evidence that his hatred, and his desire for revenge, were entertained and cherish *396 ed in bis sober moments. His declarations at the still-house, and just before his death, indicate distinctly a continuance of his revengeful purpose. That he was a violent, dangerous man, when drunk, however harmless and peacable he may have been when sober, we are fully satisfied. The proof is clear, that for about a year the defendant had been apprized of the violent hatred which the deceased entertained towards him. It is also in proof, that he was informed of the alleged ground of the deceased’s hostility. But there is nothing in the evidence, showing whether defendant was guilty of the outrage complained of by the deceased or not; nor is there any thing, showing that defendant ever sought to explain the matter, or to relieve the deceased of his suspicions. But it is in proof, that ho knew of the deceased’s hostility, and its alleged cause, and also, that the deceased was a dangerous man in liquor. He was so well apprized of these things, that when the deceased approached him at the still-house, and gave him the look described by the witness, drank the vulgar toast, and struck the proof vial in his hand, defendant at once understood these things as being “pitched” at him. To avoid a difficulty, he went to Edwards’ house, where he had previously left his gun.
That one inducement with him to go to Edwards’ house was, that his gun was there, we think may be fairly inferred, from the fact, that as soon as he reached there, he got his gun, called for powder, and sat down to put it in order; and from the fact, also, that he informed the women at the house, of the difficulty he apprehended, and his purpose to kill the deceased *397 if he came there. He evidently apprehended that the deceased would come, and he determined to be prepared.
In view of the known violence of deceased’s character, when drunk, and of deceased’s known anxiety to get defendant into a difficulty, we see nothing which was either imprudent or wrong in the fact, that the defendant left the stili-house, went to Edwards’ house, and put his gun in order. While we discover nothing indicating cowardice, on the part of defendant in leaving his house at Pleasant Plains, or the still-house, to avoid the drunken violence of the deceased, we can well understand, that even a brave man would have fears from such an enemy as deceased is shown to have been.
That defendant had fears of the deceased, and had good reason to have fears, we think the proof fully establishes. But the important question now presents itself, did he really entertain the fear of death or great bodily harm at the time he fired the gun and did the killing? and did he shoot under an honest, and well founded belief, that it was absolutely necessary for him to kill the deceased at that moment, to save himself from a like injury? To make out his justification, all these things must concur. It is not enough, that defendant honestly believed that his own life was in danger, or that he was in danger of great bodily harm from the deceased, at some future time; but he must have believed that the danger was real at the time; that it was apparent and imminent. There must have been words or overt acts at the time of shooting, clearly indicative of a present purpose, on the part of the deceased, to take his life or do him great bodily harm.
*398 The proof is, that after arranging his gun, at Edwards’ house, he set it behind the door. After the deceased came to the house, he made no hostile demonstration. He refused to go home, when Edwards advised it, but there is more probability that he declined because he wanted more brandy as he said, than that his purpose in going to the house was to have a difficulty with defendant. He aided defendant, Edwards and Til-lery in unloading the wagon. He did nothing and said nothing offensive or indicative of any purpose to attack defendant. He had his six shooter in his pocket, but it remained there. When Edwards gave deceased another drink, he got on his horse and rode off. Defendant and Tillery went into the house. In a short time deceased rode back within eight steps of the house, and called for Edwards. They were conversing about an exchange of brandy and bacon, and in that conversation, the deceased manifested his hatred for defendant, and his anxiety for revenge, by violent language already quoted. At that time defendant and Tillery were both in the house. There was nothing in the language, which indicated any present purpose to disturb the defendant. It was strongly indicative of his hostility, and his anxiety for revenge. If it was heard by defendant, he could not' have inferred that he was in danger of a.n immediate attack. If he did so understand the language, when he stepped to the door and saw the deceased sitting on his horse, with no pistol drawn, and no indication of an intended attack, with Edwards standing by him, he could not have believed that he was in imminent danger. But he probably did suppose, *399 that the deceased had returned for a difficulty, for he said to the deceased: “You have come for a fuss, and by G-d, if you don’t mind you can have it.” This remark, as far as we can see, was provoked by no word or action of the deceased. Edwards proves, that at the time defendant made the remark, “you have come for a fuss, and by G-d, if you don’t mind you can get it,” the deceased “had not said any thing to defendant, or about defendant; that is, did not mention defendant’s name.” But defendant assumed that deceased had returned for a fuss, and being well prepared, he determined to bring the matter to an issue at once, by telling deceased, “if he did not mind he could have it.” The response of the deceased was, “just walk out and you can have it; I will give you more than you can take or carry off from here.” The question here arises, was defendant then in such imminent danger, that, for the preservation - of his own life, it was absolutely necessary that he should return into the house, and get his gun from behind the door, and step out and shoot deceased? "When the deceased responded to him and invited him out, he seemed • to understand defendant’s remark as a banter or challenge; he said, “just walk out and you shall have it;” but he remained on his horse and made no demonstration of getting ready, by drawing his pistol, or otherwise.
The defendant was in no danger, when he was standing in the door, talking to ' deceased. It was only on condition that he would walk out, that deceased proposed to let him have a fuss. He had no weapon drawn, and made no attempt to draw one. Much less *400 was defendant in any danger, after be returned into the house. The deceased could not then hurt him; if he •had dismounted and attempted to enter the house, with his drawn weapons, the danger ' might then have been real, apparent and imminent. But no such thing occurred. He remained on his horse, with his pistol in his pocket, when defendant returned with his gun, and stepped on the puncheons. He was in no danger then, real, apparent or imminent; for he then saw deceased on the horse, with no pistol in his hand. In this situation, with the deceased completely in his power, he asks him, “are you in the same notion still?” ■ When the deceased saw him return with his gun, his only response to the question, was, “Let it come.” The defendant instantly fired, and the deceased was dead in a minute — his pistol still in his pocket.
That the defendant did the killing under an apprehension, honestly entertained, that the deceased might, or would, in some of his drunken moments, gratify his thirst for his blood, we think the proof fully shows; but that at the time of the killing, he was in any danger whatever of then losing his life, or that he so believed, the proof wholly fails to show.
We are, therefore, of the opinion that the verdict is sustained by the evidence, and we affirm the judgment.

 Inthe ease of Woodford Bay v. The State, decided Dee. 9, 1871, the defendant was indicted in two counts.for rape, and assault to commit rape. It *380 was held, Sneed, J., delivering llie opinion, that “The omission of the Circuit Judge to charge the law as applicable to the second count, was no error in this case. The second count charged an assault and battery, with intent to commit a rape. There is no proof in the cause to which such a charge would have been applicable, except so far as the battery is part of the accomplished fact of rape. According to the proof, the crime of rape was consummate, and the offense under the proof could have been nothing less. The charge upon the second count would, therefore, have been but an abstraction, which the Circuit Judge did very well to withhold.”